IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 30, 2008

Charles R. Fulbruge III
Clerk

————

No. 06-41749

————

UNITED STATES OF AMERICA

Plaintiff - Appellant

v.

KUN YUN JHO, OVERSEAS SHIPHOLDING GROUP INC

Defendants - Appellees

————

Appeal from the United States District Court
for the Eastern District of Texas

————

Before GARZA, STEWART, and OWEN, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The government appeals the district court's dismissal of criminal charges against Kun Yun Jho ("Jho") and Overseas Shipholding Group, Inc. ("OSG"). The counts dismissed by the district court charged that Jho and OSG knowingly failed to maintain an oil record book aboard OSG's ship the M/T PACIFIC RUBY in violation of 33 U.S.C. § 1908(a) and 33 C.F.R § 151.25. For the following reasons, we reverse the district court's dismissal and remand.

I

The M/T PACIFIC RUBY, a ship owned by OSG, transfers bulk petroleum from off-shore oil tankers to ports along the Gulf of Mexico. The M/T PACIFIC RUBY flies the flag of the Marshall Islands. During the time period at issue,

Jho served as the Chief Engineer on the ship and was responsible for the engine department operations on the ship. This position included responsibility for making entries in the ship's oil record book. An oil record book includes, among other things, a log of the ship's discharge and disposal of oil and certain oil-water mixtures. See 33 C.F.R. § 151.25(a), (d).

Based on a tip from another engineer on the M/T PACIFIC RUBY describing unlawful discharges from the ship, the Coast Guard conducted an inspection of the ship during a stop in Port Neches, Texas. The tipster also alleged that Jho manipulated some of the ship's pollution-detection equipment so that it would not recognize discharges with higher oil-content than that allowed under United States law. The Coast Guard met with the ship's captain and with Jho. They discussed oil record book entries with Jho. After this inspection, the Coast Guard determined that the ship appeared to be in compliance, and no action was taken. During a subsequent inspection at another port stop soon thereafter, the Coast Guard discovered evidence corroborating the tipster's allegations of unlawful discharges and tampering with the ship's equipment.

Based on the Coast Guard's inspections, the government brought charges against Jho and OSG. In a second superseding indictment, the government charged ten counts against both Jho and OSG: one count of conspiracy, 18 U.S.C. § 371 ("Count 1"); one count of making false statements to Coast Guard officials, 18 U.S.C. § 1001 ("Count 2"); and eight counts of knowing failure to maintain an oil record book, 33 U.S.C. § 1908(a), 33 C.F.R. § 151.25 ("Counts 3-10"). Count 1 charged Jho and OSG with conspiracy to violate 18 U.S.C. § 1001, 33 U.S.C. § 1908, and 18 U.S.C. § 1519. The eight counts charged under § 1908(a) correspond to eight different times at which the M/T PACIFIC RUBY allegedly entered a United States port with a knowingly inaccurate oil record book.

Jho and OSG each moved to dismiss their indictments on numerous grounds. Both defendants argued that international law prohibits the government from prosecuting the oil record book offenses charged in the indictments. The magistrate judge recommended that the motions to dismiss be denied in their entirety. The district judge partially modified the magistrate judge's recommendation. The district court agreed with Jho and OSG that international law prevented their prosecution for the record book offenses. Accordingly, the district court granted the defendants' motions to dismiss as to Counts 3-10, as well as to Count 1 so far as any conspiracy stemmed from the oil record book offenses. The district court denied the motions to dismiss as to Count 2 and as to the conspiracy charges in Count 1 that were unrelated to § 1908. The government appeals the district court's dismissal of the oil record book counts and the conspiracy count connected to the oil record book offenses.

II

The Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901, et seq., represents Congress' implementation of two related marine environmental treaties to which the United States is a party: the 1973 International Convention for the Prevention of Pollution from Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships. Together, these treaties are generally referred to as MARPOL 73/78 ("MARPOL"). These treaties specifically target the prevention of oil pollution in the sea. The APPS authorizes the Coast Guard to "prescribe any necessary or desired regulations to carry out the provisions of the MARPOL protocol . . . ." 33 U.S.C. § 1903(b)(1). The APPS prohibits violations of MARPOL, the APPS, and the regulations promulgated pursuant to § 1903(b). In terms of criminal sanctions, the APPS provides that, "[a] person who knowingly violates the MARPOL Protocol . . . this chapter, or the regulations issued thereunder

commits a Class D felony." 33 U.S.C. § 1908(a). Civil penalties are available for any violation, whether knowing or not. See 33 U.S.C. § 1908(b).

The criminal charges brought against Jho and OSG under § 1908(a) arise from alleged knowing violations of oil record book requirements outlined in 33 C.F.R. § 151.25. In order to help monitor and prevent pollution from oil discharges, the APPS regulations require that ships over a certain tonnage "maintain" an oil record book. See 33 C.F.R. § 151.25(a). The regulation states that the "master or other person having charge of [the] ship" is responsible for "maintenance of such record." Id. at 151.25(j).[1] The oil record book must be kept on board the ship and "be readily available for inspection at all reasonable times." Id. at 151.25(I). APPS regulations give the Coast Guard authority to board the ship and inspect the ship for compliance with MARPOL, the APPS, and APPS regulations. Id. at 151.23(a); see 14 U.S.C. §89(a). In conducting inspections to identify vessels that have polluted or are likely to pollute[2] in violation of the APPS, Coast Guard personnel rely on statements of the vessel's crew as well as the vessel's registration and compliance documentation. The Coast Guard's inspection authority includes the ability to examine the oil record book kept by a ship. See 33 C.F.R. § 151.23(c).

The APPS provides two pertinent limitations on the application of § 1908(a) and 33 C.F.R. § 151.25. First, the record book requirements of 33 C.F.R. § 151.25 only apply to foreign-flagged ships, such as the M/T PACIFIC RUBY, "while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States." 33 C.F.R. § 151.09(a)(5);

---

[1] On appeal, Jho argues that he is not the "master or other person having charge of [the] ship." The district court mentioned this point, but did not rely on it in making its decision. See United States v. Kun Yun Jho, 465 F. Supp. 2d 618, 624 n. 2 (E.D. Tex. 2006). Even assuming this to be true, it is inapposite as the government charged Jho with aiding and abetting the oil record book offenses.

[2] APPS regulations allow the Coast Guard to detain a ship if its violations indicate that the ship presents "an unreasonable threat of harm to the marine environment." 33 C.F.R. § 151.23(b).

see also 33 U.S.C. § 1902(a) (limiting application of the APPS to foreign-flagged vessels while they are in the "navigable waters of the United States"). Second, the APPS states that, "[a]ny action taken under [Chapter 33] shall be taken in accordance with international law." 33 U.S.C. § 1912. Focusing on the limitation imposed by § 1912, the district court dismissed the oil record book counts against Jho and OSG. As phrased by the district court, § 1912 "circumscribes" the enforcement scheme created by APPS and prevents the government from prosecuting a § 1908(a) violation where prosecution would violate principles of international law. See United States v. Kun Yun Jho, 465 F. Supp. 2d. 618, 624 (E.D. Tex. 2006). Because the district court held that prosecution of the oil record book offenses would violate principles of international law, it dismissed those counts of the indictments against Jho and OSG. Id. at 624-26.

We review de novo a district court's dismissal of an indictment based on its interpretation of the underlying criminal statute. See United States v. Flores, 404 F.3d 320, 326 (5th Cir. 2005).

III

A

The district court stated that "[h]ere, the United States government is seeking to criminally prosecute a foreign flag ship for alleged violations of U.S. Coast Guard regulations that occurred aboard ship and outside U.S. waters." Jho, 465 F. Supp. 2d. at 625 (citing 33 C.F.R. § 151.25). Framing the alleged criminal conduct in this way, the district court identified multiple sources of international law that it found to prevent prosecution pursuant to 33 U.S.C. § 1912. Before reaching those sources, we first conclude that the district court erred in construing the criminal conduct alleged against Jho and OSG to have occurred "outside U.S. waters."

5

The indictment alleges that Jho failed to maintain an accurate oil record book on eight separate dates. On each of the dates listed in the indictment, the M/T PACIFIC RUBY docked in a U.S. port. In contrast to the district court's characterization of the oil record book offenses, we read the indictment to allege eight knowing failures to maintain an oil record book that each occurred entirely within the ports of the United States. As explained below, the statute, its purposes, and related case law reinforce this reading of the indictment.

The defendants argue that § 151.25's requirement that an oil record book be "maintained" does not impose a separate substantive duty. Instead, the defendants contend that the only duty imposed under § 151.25 is a duty to make the requisite entries in the oil record book. Consequently, the defendants claim that the offense conduct took place outside of U.S. ports or navigable waters because the allegedly incorrect entries were made in international waters. However, ignoring the duty to maintain puts the regulation at odds with MARPOL and Congress' clear intent under the APPS to prevent pollution at sea according to MARPOL.[3] Under 33 C.F.R. § 151.09 and 33 U.S.C. § 1902(a), the record book requirements may be enforced against foreign-flagged ships only for violations that occur within the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States. Accurate oil record books are necessary to carry out the goals of MARPOL and the APPS. If the record books did not have to be "maintained" while in the ports or navigable waters of the United States, then a foreign-flagged vessel could avoid application of the record book requirements simply by falsifying all of its record book information just before entry into a port or navigable waters. If the oil record

---

[3] MARPOL provides the basis for the oil record book requirements found in § 151.25. See MARPOL Annex I, Reg. 20, reprinted in MARPOL 73/78: Articles, Protocols, Annexes, Unified Interpretations of the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978 relating thereto 94 (Int'l Mar. Org. 2001). MARPOL also allows for concurrent jurisdiction between a flag state and a non-flag state when MARPOL violations occur within the jurisdiction of the non-flag state. See MARPOL art. 4(2), reprinted in MARPOL 73/78 at 5.

book requirements could be avoided in this manner, the Coast Guard's ability to conduct investigations against foreign-flagged vessels would be severely hindered, and the regulation would allow polluters (and likely future polluters) to avoid detection. We refuse to conclude that by imposing limitations on the APPS's application to foreign-flagged vessels Congress intended so obviously to frustrate the government's ability to enforce MARPOL's requirements. Instead, we read the requirement that an oil record book be "maintained" as imposing a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States.

Other courts have recognized that 33 U.S.C § 1908(a) and 33 C.F.R. § 151.25 impose criminal liability on foreign-flagged vessels for conduct carried out within the ports and navigable waters of the United States. The Third Circuit recently addressed the scope of offense conduct under 33 C.F.R. § 151.25 for the purposes of a relevant conduct analysis under the Sentencing Guidelines. See United States v. Abrogar, 459 F.3d 430 (3d Cir. 2006). Abrogar pleaded guilty to a charge of knowing failure to maintain an oil record book under § 1908(a) and § 151.25. See id. at 433. Abrogar did not dispute the content of the charge. However, the court was required to determine the scope of his offense conduct for purposes of its relevant conduct analysis. The court concluded that "the precise nature of Abrogar's offense of conviction under the Guidelines is most accurately described as failure to maintain an accurate oil record book while in the navigable waters of the United States." Id. at 435 (internal quotation marks omitted). In reaching this conclusion, the court noted that the APPS and its regulations "exclude from criminal liability the failure to maintain an accurate oil record book by foreign vessels outside U.S. waters." Id. (internal quotation marks omitted).

Explicitly rejecting the reasoning of the district court in this case, two district courts recently held that knowing violations of 33 C.F.R. § 151.25 carried out by foreign-flagged vessels in U.S. ports may be prosecuted under 33 U.S.C. § 1908(a) as wholly domestic offenses. See United States v. Ionia Management, S.A., 498 F. Supp. 2d 477, 485 (D. Conn. 2007); United States v. Petraia Maritime, Ltd., 483 F. Supp. 2d. 34, 39 (D. Me. 2007). In Ionia Management, the court recognized that the "gravamen" of the action was "not the pollution itself, or even the Oil Record Book violation occurring at that time, but the misrepresentation in port." 498 F. Supp. 2d at 487 (quoting United States v. Royal Caribbean Cruises, Ltd., 11 F. Supp. 2d 1358, 1371 (S.D. Fla. 1998)).[4] We read the government's indictment in this case in a similar fashion, as charging Jho and OSG with failing to maintain the oil record book while in port.

For the foregoing reasons, we conclude that 33 U.S.C. § 1908(a) can be read to criminalize knowing violations of 33 C.F.R. § 151.25 carried out by foreign-flagged vessels while in a United States port, and that the government's indictment charges such conduct against Jho and OSG. On appeal, Jho and OSG argue that charging eight counts under § 1908(a) amounts to a multiplicitous indictment, because the same offense conduct is charged in multiple counts of the indictment. See United States v. Planck, 493 F.3d 501, 503 (5th Cir. 2007) ("In deciding whether an indictment is multiplicitous, we

---

[4] The Royal Caribbean court reached a similar conclusion for a criminal charge brought under 18 U.S.C. § 1001: holding that presentation of an inaccurate oil record book in a U.S. port establishes a domestic violation of the False Statement Act. See Royal Caribbean, 11 F. Supp. 2d at 1371. The district courts in Ionia Management and Petraia Maritime both relied on the Royal Caribbean case in reaching their holdings under § 1908. In Ionia Management, the court considered a charge brought under § 1908 based on the defendant's actions during a U.S. Coast Guard inspection. 498 F. Supp. 2d at 480 ("Count two charges that defendant . . . knowingly failed and caused the failure to maintain an Oil Record Book . . . during a U.S. Coast Guard inspection."). While the facts underlying the charge in Petraia Martime are unclear, the court's heavy reliance on Royal Caribbean suggests that the court only considered the "presentation" of a false or inaccurate record book. See Petraia Maritime, 483 F. Supp. 2d at 39 ("The case at hand presents no distinguishing facts or circumstances [from Royal Caribbean].").

look to whether separate and distinct prohibited acts, made punishable by law, have been committed."). The government contends that Jho and OSG committed a distinct criminal act each time they entered a port of the United States with a record book known to be inaccurate, and therefore, the M/T PACIFIC RUBY's eight separate port entries constitute eight separate violations. The district court did not consider this issue and the record is not developed sufficiently to allow us to determine at this time how many counts properly can be charged against Jho and OSG in this case. Accordingly, we leave to the district court, in the first instance, the question of whether the indictments are multiplicitous.

B

With the port-based nature of the offense conduct in mind, we now turn to whether international law limits the prosecution of the oil record book counts. "A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." Wilson v. Girard, 354 U.S. 524, 529 (1957). In Cunard S.S. Co. v. Mellon, the Supreme Court recognized "that the territory subject to [United States'] jurisdiction includes the land areas under its dominion and control, the ports, harbors, bays and other enclosed arms of the sea along its coast and a marginal belt of the sea extending from the coast line outward a marine league, or three geographic miles." 262 U.S. 100, 122 (1923) (emphasis added). Further, "[i]t is part of the law of civilized nations that, when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place to which it goes, unless, by treaty or otherwise, the two countries have come to some different understanding." Mali v. Keeper of the Common Jail, 120 U.S. 1, 11 (1887) ("Widenhus' Case"); see United States v. Dickelman, 92 U.S. 520, 525 (1875) ("The merchant vessels of one country visiting the ports of another for the purpose of trade subject themselves to the laws which govern the port they visit, so long as

they remain."); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 512, reporter's note 5 (1987) (same). A state's exercise of jurisdiction over foreign-flagged ships in its ports is permissive, and a port state may, based on comity concerns, decide not to exercise its jurisdiction. See Widenhus' Case, 120 U.S. at 12; Thomas J. Schoenbaum, 1 ADMIRALTY AND MARITIME LAW § 3-12, at 148 (4th Ed. 2004). However, the United States has decided to exercise its criminal jurisdiction in this case, and thus, the charges against Jho and OSG will stand unless the United States has consented to surrender its jurisdiction to prosecute oil record book offenses carried out in United States' ports. See Cunard, 262 U.S. at 125-29 (holding that, because the statute did not reflect any limitation on the traditional scope of United States' jurisdiction, the National Prohibition Act applied to foreign-flagged vessels while in United States' territorial waters or ports); cf. Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 142-147 (1957) (holding that Congress did not intend the Labor Management Relations Act to apply to labor disputes aboard a foreign ship operated entirely by foreign seamen, simply because the ship was picketed by American unions while temporarily in an American port).

Jho and OSG argue that § 1912 represents the United States' consent to surrender its jurisdiction to prosecute APPS violations where prosecution is not "in accordance with international law." 33 U.S.C. § 1912. However, the sources of international law relied upon by the district court in dismissing the oil record book charges do not limit the government's jurisdiction to prosecute violations of domestic law committed in port. First, the district court relied on the law of the flag doctrine. The traditional statement of the doctrine provides that a merchant ship is part of the territory of the country whose flag she flies, and that actions aboard that ship are subject to the laws of the flag state. See Cunard, 262 U.S. at 123. However, the district court read this doctrine too broadly in finding that it prevented the prosecution of the oil record book

offenses in this case. Even Lauritzen v. Larsen, 345 U.S. 571 (1953), a choice of law case which the district court cited for its statement of the law of the flag, recognized that jurisdiction may be exercised concurrently by a flag state and a territorial state. See Lauritzen, 345 U.S. at 585 (citing United States v. Flores, 289 U.S. 137, 155-59(1933)). The law of the flag doctrine does not mandate that anything that occurs aboard a ship must be handled by the flag state. In fact, the Supreme Court has recognized that the law of the flag doctrine does not completely trump a sovereign's territorial jurisdiction to prosecute violations of its laws: "[The law of the flag doctrine] is chiefly applicable to ships on the high seas, where there is no territorial sovereign; and as respects ships in foreign territorial waters it has little application beyond what is affirmatively or tacitly permitted by the local sovereign." Cunard, 262 U.S. at 123; see RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 502, cmt. d (1987) ("The flag state['s] . . . jurisdiction is not exclusive when the ship is in a port or internal waters of another state."). We note also that the limitations imposed by 33 U.S.C. § 1902 and 33 C.F.R. § 151.09 track the general principles of the law of the flag. Accordingly, we find that the oil record book offenses in this case were charged "in accordance with" the law of the flag. See 33 U.S.C. § 1912.

The district court also relied on articles 216 and 230 of the THIRD UNITED NATIONS CONVENTION ON THE LAW OF THE SEA (1982), 21 I.L.M. 1245 (1982) (hereinafter UNCLOS). See Jho, 465 F. Supp. 2d at 625. The United States is not a party to UNCLOS as the Senate has not ratified the treaty.[5] As such, the "international law" referred to in § 1912 incorporates UNCLOS only to the extent that UNCLOS reflects customary international law. See Mayaguezanos

---

[5] See U.S. Const. art. II, § 2 ("[The President] shall have power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."); United Nations, Chronological list of ratifications, accessions and successions to the Convention, http://www.un.org/depts/los/reference_files/chronological_lists_of_ratifications.htm#The%20United%20 Nations%20Convention%20on%20the%20Law%20of%20the%20Sea (indicating that as of June 4, 2008 the United States had not ratified UNCLOS).

por la Salud y el Ambiente v. United States, 198 F.3d 297, 304 n. 14 (1st Cir. 1999) ("[UNCLOS] has been signed by the President, but it has not yet been ratified by the Senate. Consequently, we refer to UNCLOS only to the extent that it incorporates customary international law."). Whether these particular UNCLOS articles constitute customary international law is a question that we need not answer at this time.[6] Assuming arguendo that these provisions of UNCLOS constitute international law under § 1912, they do not require dismissal of the oil record book counts in this case.

The district court first relied on article 216(1) of UNCLOS.[7] Article 216(1) provides that certain laws and regulations for the prevention, reduction and control of pollution by "dumping" shall be enforced:

> (a) by the coastal State with regard to dumping within its territorial sea or its exclusive economic zone or onto its continental shelf;
> (b) by the flag State with regard to vessels flying its flag or vessels or aircraft of its registry;
> (c) by any State with regard to acts of loading of wastes or other matter occurring within its territory or at its off-shore terminals.

UNCLOS art. 216(1), 21 I.L.M. at 1312 (emphasis added). UNCLOS defines "dumping" as "any deliberate disposal of wastes or other matter from vessels," but notes that "dumping does not include . . . the disposal of wastes or other

---

[6] Sources are unclear as to which provisions of UNCLOS constitute customary international law. See United States v. Alaska, 503 U.S. 569, 588 n. 10 (1992) (indicating that the United States conceded that the coastal "baseline provisions" of UNCLOS reflect customary international law); Lori F. Damrosch et al., INTERNATIONAL LAW: CASES AND MATERIALS 1385-88 (4th ed.2001) (stating that many provisions of UNCLOS are established as customary international law of the sea); Thomas J. Schoenbaum, 1 ADMIRALTY AND MARITIME LAW § 2-2, at 23-25 (4th Ed. 2004) (examining which portions of UNCLOS have been recognized by the United States). A panel of the Ninth Circuit recently assumed, seemingly without deciding, that UNCLOS constitutes customary international law for the purposes of establishing a claim under the Alien Tort Claims Act. See Sarei v. Rio Tinto, PLC, 487 F.3d 1193, 1210 (9th Cir. 2007). Sarei is currently set for rehearing en banc before the Ninth Circuit. See 499 F.3d 923 (9th Cir. 2007).

[7] The district court treated Article 216 as a "codification of the long-standing international maritime rule known as 'the law of the flag.'" Jho, 465 F. Supp. 2d at 625. To the extent that the district treated article 216 as a codification of the law of the flag, we reject its reliance on article 216 for the same reasons stated, supra, regarding the law of the flag doctrine.

matter incidental to, or derived from normal operations of vessels." UNCLOS art. 1(5), 21 I.L.M. at 1271. The district court also referred to article 230(2) which provides:

> Monetary penalties only may be imposed with respect to violations of national laws and regulations or applicable international rules and standards for the prevention, reduction and control of pollution of the marine environment, committed by foreign vessels in the territorial sea, except in the case of a wilful and serious act of pollution in the territorial sea.

UNCLOS art. 230(2), 21 I.L.M. at 1315 (emphasis added).

In prescribing the power to enforce marine pollution laws, UNCLOS provides for three categories of states: port states, coastal states, and flag states. See UNCLOS art. 217, 218, and 220, 21 I.L.M. at 1312-13 (describing enforcement by flag states, port states, and coastal states respectively). Port states may exercise jurisdiction over a foreign-flagged vessel while that vessel is voluntarily in the state's port. See UNCLOS art. 218 & 220(1), 21 I.L.M. at 1312-13; RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 512, reporter's note 5 (collecting Supreme Court cases). Coastal states may exercise jurisdiction to enforce pollution laws against foreign-flagged vessels operating in the state's "coastal zones," which are geographic belts of the sea extending a certain limited distance from the state's coast. See UNCLOS art. 220(2)-220(8), 21 I.L.M. at 1313; Schoenbaum, 1 ADMIRALTY AND MARITIME LAW §§ 2-16-2-18 (describing zones of maritime jurisdiction); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 511 (same). The "territorial sea" referred to in Article 230(1) above is a coastal zone defined by UNCLOS as a belt of sea not exceeding 12 nautical miles from the coast. See UNCLOS art. 3, 21 I.L.M. at 1272.[8] Flag states may exercise

---

[8] The Restatement tracks the UNCLOS definition of four "coastal zones": (1) the "territorial sea: a belt of sea that may not exceed 12 nautical miles" from the coastal baseline; (2) the "contiguous zone: a belt of sea contiguous to the territorial sea, which may not extend beyond 24 nautical miles from the baseline from which the breadth of the territorial sea is measured"; (3) "the continental shelf"; and (4) "the exclusive economic zone: a belt of sea beyond the territorial sea that may not exceed 200 nautical

jurisdiction over those vessels registered in the flag state. See UNCLOS art. 217, 21 I.L.M. at 1312; RESTATEMENT(THIRD) OF FOREIGN RELATIONS LAW § 502. The M/T PACIFIC RUBY is registered in and flies the flag of the Marshall Islands, and thus is a foreign-flagged vessel in relation to the United States.[9]

UNCLOS's labeling of coastal states and port states is not static. The categorization depends upon a foreign-flagged vessel's proximity to a state, and whether that vessel has voluntarily entered the state's port. For example, while the M/T PACIFIC RUBY was in the coastal zones of the United States, the United States operated as a coastal state under UNCLOS. During the times that the M/T PACIFIC RUBY was voluntarily in a U.S. port, the United States was authorized to act as a port state under UNCLOS.

The UNCLOS provisions cited by the district court represent only a selected portion of the international enforcement scheme created by UNCLOS for the protection and preservation of the marine environment.[10] Articles 216 and 230(2) concern the enforcement power of flag states and coastal states; these specific provisions fail to reflect the fact that UNCLOS actually broadens the traditional authority given to a port state. Neither these provisions nor any other provisions of the UNCLOS enforcement scheme suggest that the limitations imposed by articles 216 and 230 apply to the in-port, oil record book offenses charged in this case.

---

miles from the baseline from which the breadth of the territorial sea is measured." See RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 511 (relying on articles 2, 3, 5, 8, 33, 55, 57, and 76 of UNCLOS). The coastal state's authority to pursue offenses against its laws and its ability to claim to natural resources differ depending on the particular coastal zone at issue. See id. at cmt. a.

[9] The Republic of the Marshall Islands is an island nation in the Pacific Ocean. The Marshall Islands obtained independence in 1986 after almost four decades as a U.N. territory under United States administration. See, CIA World Factbook, Marshall Islands, https://www.cia.gov/library/publications/the-world-factbook/geos/rm.html (last updated June 10, 2008).

[10] Part XII of UNCLOS, or articles 192-237, provides for the "Protection and Preservation of the Marine Environment." 21 I.L.M. at 1308-1316. The powers of and limitations on enforcement of marine pollution laws are found at articles 213-33. See 21 I.L.M. at 1311-1315.

With respect to criminal jurisdiction, article 27 of UNCLOS provides specific limitations on a coastal state's exercise of jurisdiction over a foreign-flagged vessel passing through the coastal state's territorial sea. See UNCLOS art. 27(1), 21 I.L.M. at 1275. However, these limitations disappear when a foreign vessel "pass[es] through the territorial sea after leaving internal waters") in those circumstances a coastal state may exercise its criminal jurisdiction by taking "any steps authorized by its laws for the purpose of an arrest or investigation on board a foreign ship." UNCLOS art. 27(2), 21 I.L.M. at 1275; See Schoenbaum, 1 ADMIRALTY AND MARITIME LAW § 2-14, at 36 n. 4. Article 27 suggests that, under UNCLOS, the criminal jurisdiction of a coastal state expands in relation to a foreign-flagged vessel's proximity to the state. While article 27 speaks specifically to coastal states, this proximity principle is consistent with the greater power given to port states as compared to coastal states regarding enforcement of marine pollution laws under Part XII of UNCLOS.

As discussed above, it has long been established that a state has the power to prosecute violations of its laws committed by foreign-flagged vessels in its ports, as long as the port state has not abdicated the authority to do so. UNCLOS does not limit, but broadens, this traditional rule when it comes to the power of port states to enforce marine pollution laws. The enforcement scheme created by UNCLOS provides port states the power to pursue violations beyond those that occur in its ports. UNCLOS allows port states to pursue violations of marine pollution laws that occur within the port state's territorial sea or exclusive economic zone. See UNCLOS art. 220(1), 21 I.L.M. at 1313. UNCLOS goes further in broadening the authority of port states in order to increase their role in preventing marine pollution. Article 218 provides a port state with power to institute proceedings based on pollution violations that occurred entirely outside its coastal zones. See UNCLOS art. 218, 21 I.L.M. at 1312-13;

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW §512, reporter's note 7; Ted L. McDorman, Port State Enforcement: A Comment on Article 218 of the 1982 Law of the Sea Convention, 28 J. MAR. L. & COM. 305, 312-322 (1997) (noting that UNCLOS article 218 expands the jurisdiction of a port state to institute proceedings, in certain circumstances, against foreign-flagged vessels based on offenses that occurred on the high seas).

The specific UNCLOS provisions cited by the district court, articles 216 and 230, do not limit the authority exercised by port states under UNCLOS. Article 216 provides that coastal states may seek enforcement against vessels when "dumping" occurs "within its territorial sea or its exclusive economic zone or onto its continental shelf." Under article 216, flag states may enforce dumping laws against ships bearing its registry. And article 230(2) limits the remedies available to a state pursuing "violations . . . committed by foreign vessels in the territorial sea [i.e., a coastal zone]." Nothing in these articles or the remaining provisions of the UNCLOS enforcement scheme limits the power of a state to prosecute violations of its criminal laws that occur after a ship has voluntarily entered its port. Instead, UNCLOS broadens the traditional authority of a port state to allow a port state to pursue violations of marine pollution law that occur outside of its ports, and in some circumstances, outside of its coastal zones.[11]

In sum, we reject the idea that 33 U.S.C. § 1912 prevents prosecution of the oil record book offenses charged against Jho and OSG. Neither UNCLOS nor

---

[11] In urging ratification of UNCLOS, the Senate Committee on Foreign Relations submitted an Executive Report to the Senate. S. Exec. Rep. No. 108-10 (2004). In the report, the Committee stated the following in explaining its interpretation of UNCLOS's enforcement scheme:

> The United States understands that sections 6 and 7 of Part XII [i.e., UNCLOS's enforcement sections] do not limit the authority of a State to impose penalties, monetary or nonmonetary, for . . . any violation of national laws and regulations . . . [concerning] the prevention, reduction and control of pollution of the maritime environment that occurs while a foreign vessel is in any of its ports, rivers, harbors, or offshore terminals.

Id. at 20 (emphasis added).

the law of the flag doctrine encroaches on the well-settled rule that a sovereign may exercise jurisdiction to prosecute violations of its criminal laws committed in its ports. Far from signaling an abdication of this traditional authority, the APPS indicates Congressional willingness to criminalize knowing violations of MARPOL, the APPS, and APPS regulations committed by foreign-flagged ships while in United States' ports and navigable waters. See 33 U.S.C. §§ 1908(a) & 1902(a); 33 C.F.R. § 151.09. Because the conduct the government charges against Jho and OSG in Counts 3-10 occurred entirely within the ports of the United States, 33 U.S.C. § 1912 presents no obstacle to the government's prosecution of those counts.

IV

For the foregoing reasons, we REVERSE the district court's dismissal of the oil record book charges brought against Jho and OSG under 33 U.S.C. § 1908(a) and 33 C.F.R. § 151.25 in Counts 3-10, as well as its dismissal of the conspiracy charge in Count 1 so far as it derives from the oil record book offenses. We REMAND for further proceedings consistent with this opinion.